**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Miami-Dade Division**
**Case No.: 1:21-cv-22410-MGC**

THOMAS SEIFERT,

       Plaintiff,

vs.                                                    **AMENDED COMPLAINT**

ORBSAT, a Nevada corporation,
and CHARLES M. FERNANDEZ,
individually,

       Defendants.

_____/

    Plaintiff, THOMAS SEIFERT ("SEIFERT"), by and through the undersigned counsel,

sues Defendants ORBSAT CORP., a Nevada corporation ("ORBSAT"), and CHARLES M.

FERNANDEZ ("FERNANDEZ"), and further states:

**JURISDICTION, PARTIES, AND VENUE**

    1.     This Court has original jurisdiction to hear this complaint and to adjudicate the

claim stated herein under 28 U.S.C. § 1332 as the matter in controversy exceeds the sum of

$75,000, exclusive of interest and costs, and the requirement of complete diversity is satisfied as

the parties are citizens of different states.

    2.     At all times material, Plaintiff SEIFERT was and is a resident of Parker, Colorado,

and is *sui juris*.

    3.     At all times materials, Defendant ORBSAT was a Nevada corporation, and has its

principal place of business in Miami-Dade County, Florida.

    4.     At all times material, Defendant FERNANDEZ was and is a resident of the state of

Florida and is *sui juris*.

5.　　Venue properly lies in Miami-Dade County as the acts and omissions giving rise to this claim occurred in Miami-Dade County, and Defendants ORBSAT and FERNANDEZ transact business in Miami-Dade County, Florida.

6.　　All conditions precedent to the bringing of this action have been met, have occurred or have otherwise been waived.

7.　　In accordance with applicable law, SEIFERT shall be entitled to recoup his reasonable attorney's fees upon prevailing in this action, and hereby places ORBSAT and FERNANDEZ on notice of his claim for such fees.

## GENERAL ALLEGATIONS

8.　　 ORBSAT is a publicly traded company engaged in providing mobile and satellite communications services and solutions primarily in government, commercial and military settings.

### SEIFERT'S Tenure with ORBSAT Culminating in June 2, 2021 Three-Year "Term" Employment Agreement

9.　　SEIFERT is a corporate financial professional and consultant who specializes in servicing publicly traded companies, including bringing companies into compliance with financial and securities requirements prior to being listed for public trade on trading platforms.

10.　　SEIFERT worked for ORBSAT in 2015-2016, having known its then Chief Executive Officer, David Phipps, professionally since 2003. Mr. Phipps recruited SEIFERT to ORBSAT.

11.　　During SEIFERT's tenure at ORBSAT from 2015-2016, he provided services as a "CFO consultant" as an independent contractor. SEIFERT's engagement with ORBSAT ended on amicable terms in 2016, when he completed the scope of his services and recruited and onboarded his own replacement.

12.     As SEIFERT maintained a positive relationship with Mr. Phipps and ORBSAT, at Mr. Phipps' request, SEIFERT rejoined ORBSAT in October 2020, to assist the company's efforts to be "uplisted" on the Nasdaq electronic trading platform and a related public offering.  SEIFERT worked closely with Mr. Phipps, who worked out of ORBSAT's offices in the United Kingdom, while SEIFERT worked remotely from his residence in Colorado.

13.     SEIFERT was responsible for overseeing the company's accounting and financial planning operations, assisting in decision-making, assisting with setting strategy, and ORBSAT benefitted from SEIFERT's professional knowledge and experience.

14.     In March 2021, ORBSAT extended SEIFERT a one-year employment agreement as Chief Financial Officer.  A copy of the March 11, 2021, employment agreement is attached as _Exhibit "1."_

15.     The March 11, 2021 employment agreement was intended to be a temporary arrangement, as Mr. Phipps and ORBSAT promised SEIFERT that upon successful completion of ORBSAT's anticipated Nasdaq uplisting and public offering SEIFERT would be protected in his CFO position for the long term, would receive an executive-level agreement on improved terms, together with an executive salary, and additional company stock.

16.     On or about May 28, 2021, due in large part to SEIFERT's assistance and participation, ORBSAT was approved by the Nasdaq platform and successfully participated in a $14 million public offering.

17.     Thereafter, in recognition of SEIFERT's contributions to the company's successful uplisting to the Nasdaq platform and a public offering, and consistent with earlier promises and representations, ORBSAT extended SEIFERT a new employment agreement for a three-year renewable term, and an increased annual salary of $240,000.00 plus annual bonuses and other

benefits, and well as additional stock ownership.

18. On June 2, 2021, ORBSAT's compensation committee reviewed and approved Mr. Phipps' and SEIFERT's new employment agreements and compensation packages, and thereafter on that same date, the Board of Directors convened for a meeting and approved both agreements and compensation packages as part of the business conducted at that meeting. The Board meeting agenda and resolutions reflected this item.

19. SEIFERT's employment agreement was drafted by a member of the Board of Directors. SEIFERT's only negotiation was with FERNANDEZ and his only suggested change was an increase in his salary to $240,000. SEIFERT suggested no other changes to the agreement drafted by the Board member, and the agreement was subsequently approved by the Board on June 2, 2021.

20. On June 2, 2021, SEIFERT accepted and executed the new employment agreement, which became effective immediately. Mr. Phipps executed SEIFERT's June 2, 2021 employment agreement while Phipps was still ORBSAT's Chief Executive Officer. A copy of SEIFERT's June 2, 2021 employment agreement is attached as _Exhibit "2."_ Under the June 2, 2021 employment agreement, SEIFERT served as ORBSAT's CFO, Secretary and Treasurer.

21. As of June 2, 2021, SEIFERT was also identified as an officer of ORBSAT with Florida's Secretary of State on ORBSAT's public filings allowing it to transact business in the State of Florida.

## FERNANDEZ Becomes CEO of ORBSAT

22. In early June 2021, ORBSAT's executive staff underwent a shift and FERNANDEZ replaced Mr. Phipps as ORBSAT's Chief Executive Officer effective June 7, 2021. Mr. Phipps remained with the company as its President.

23.     FERNANDEZ retained personal counsel to negotiate FERNANDEZ' employment agreement with ORBSAT.  The personal counsel FERNANDEZ used was Gary Phillips.

24.     FERNANDEZ is based in and operates ORBSAT from South Florida.

**First Spoofed Email Phishing Scheme on FERNANDEZ's Friends and Associates Investing in ORBSAT's Offering**

25.     On information and belief, in addition to providing personal counsel to FERNANDEZ, Mr. Phillips, amongst other FERNANDEZ friends and associates, also sought to participate in the public offering and attempted to open an account at the firm underwriting the offering, Maxim Group, LLC ("Maxim").

26.     On further information and belief, on or around May 27, 2021, Mr. Phillips and other FERNANDEZ friends and associates initially attempted to wire transfer their personal funds to Maxim to make their investment.  On or around May 28, 2021, FERNANDEZ told SEIFERT via email and verbally that when one or more of his friends and associates, potentially including Mr. Phillips, attempted to wire transfer their investment funds to Maxim, there was "fraud in the wire" but that FERNANDEZ did not have the details and asked SEIFERT to speak with Maxim.

27.     Maxim advised SEIFERT that they contacted both their bank and the bank receiving the misdirected funds and were investigating the situation.  SEIFERT then relayed this information to FERNANDEZ, and thereafter Maxim called FERNANDEZ directly and advised there had been a suspicious, possibly spoofed, email that provided false wire instructions causing FERNANDEZ associates' investor funds to be misdirected to an imposter account.

28.     On or around May 31, 2021, FERNANDEZ told SEIFERT that it was FERNANDEZ's desire to possibly have ORBSAT reimburse any of FERNANDEZ's friends and associates that may have fallen victim to the phishing scheme with the false wire instructions.

29.     On or around June 1, 2021, Maxim advised SEIFERT they were still investigating

and considering how to accommodate those affected by the apparent email phishing scheme.

### SEIFERT'S Objection to FERNANDEZ Instructing Him to Ignore Fiduciary Duties Owed to ORBSAT in Violation of Applicable Law

30.     On Saturday, June 12, 2021, a week after FERNANDEZ assumed his position as the new CEO of ORBSAT, FERNANDEZ instructed SEIFERT via email to remit $25,000 to Gary Phillips, to retain Mr. Phillips as counsel for ORBSAT.  SEIFERT knew that Mr. Phillips was FERNANDEZ's personal attorney (and on information and belief, an ORBSAT investor involved in the first email phishing scheme) who shared an attorney-client relationship with FERNANDEZ and had just negotiated FERNANDEZ's employment agreement.  SEIFERT also understood that FERNANDEZ's unilateral decision to retain his personal counsel on behalf of ORBSAT, particularly without an ORBSAT conflict waiver from disinterested directors, may have been in violation of ORBSAT's Bylaws, corporate governance and federal requirements for publicly traded companies.

31.     In a responsive June 12, 2021 email, SEIFERT pointed out to FERNANDEZ the apparent conflict of interest in hiring FERNANDEZ's personal attorney as ORBSAT's counsel and the problem with ignoring internal accounting controls as it is unlawful to do so for a public company.  SEIFERT explained that any such transaction should be backed by a written retainer agreement which should be negotiated at "arm's length" prior to remitting any retainer funds, as SEIFERT understood the importance of internal accounting controls on company funds, particularly pursuant to applicable rules enforced by the Securities and Exchange Commission (the "SEC"), including specifically 15 U.S.C. §78m(b)(2),(5), and Exchange Act Rule 13b2-1, 17 C.F.R. § 240.13b2-1. In a concession to his boss's expressed intent to retain Mr. Phillips, SEIFERT's email also stated, "If (sic) hope you understand and hopefully we can figure out a way to make it work."

32.     In sending the email, SEIFERT was complying with his duties as Chief Financial Officer of a publicly traded company, and his fiduciary duties to the company and its shareholders, which included avoiding conflict of interest transactions, complying with Bylaws, and maintaining compliance with internal accounting controls all in accordance with applicable SEC rules. At a minimum, corporate auditors would require documentation in the form of an arm's length retainer agreement, and corporate standards required that any potentially conflicted transactions be vetted and approved by disinterested directors.   In sum, SEIFERT was doing his job to ensure that ORBSAT did not violate applicable law.

33.     Within minutes of SEIFERT objecting to FERNANDEZ's instruction to remit to FERNANDEZ's personal counsel $25,000, FERNANDEZ apparently realized that he had asked the wrong person to assist ORBSAT with such engaging in unlawful activity and attempted to cover his tracks with plausible deniability by sending a contrived email to SEIFERT that appeared to acknowledge that SEIFERT was correct, stating, "No problem. I was going to use him to ... We won't use him..."  A copy of the June 12, 2021 email exchange regarding retention of legal counsel is attached as *Exhibit "3."*

34.     FERNANDEZ's June 12 email to SEIFERT, in which he appeared to desist from hiring his personal attorney and shirking applicable internal accounting controls, was a front, and did not reveal his true retaliatory scheme against SEIFERT which would soon come to light. Concerned by FERNANDEZ's request to remit $25,000 of ORBSAT's funds to his personal counsel without regard for internal accounting controls or apparent conflicts of interest, even though it was Saturday, SEIFERT sent a text message to ORBSAT's SEC regulatory counsel asking to speak.  When they spoke early the following work week, SEIFERT relayed the series of events to SEC regulatory counsel who advised SEIFERT he would speak with FERNANDEZ

about the issue.

35.     Unable to connect with ORBSAT's SEC regulatory counsel on a weekend, on Saturday, June 12, 2021, SEIFERT also began trying to connect with other SEC regulatory counsel to discuss his personal obligations and potential liability if he were to remit the funds FERNANDEZ requested be sent.

36.     Despite FERNANDEZ's contrived written record purporting to recognize that SEIFERT's objection was warranted, within hours of the email exchange, during the afternoon on Saturday, June 12, 2021 FERNANDEZ called SEIFERT unexpectedly in a conference call with Mr. Phipps, and proceeded to excoriate SEIFERT for having undermined his authority, engaging in "insubordination," and threatened SEIFERT with (i) immediate termination for cause and (ii) to sue SEIFERT for "fraud" because he claimed SEIFERT was "not qualified" to be CFO of a Nasdaq-traded company.

37.     FERNANDEZ did not state why he believed SEIFERT to be unqualified, and at no time during the telephone call did FERNANDEZ mention or address any other wrongdoing on SEIFERT's part in connection with any aspect of his employment.   FERNANDEZ's only ground for threatening SEIFERT's employment was SEIFERT's objection to sending company funds to retain FERNANDEZ's personal attorney in an unlawful manner.

38.     After being threatened, SEIFERT stated he stood by his email and that he sent it because it was in the best interest of the company. FERNANDEZ then told SEIFERT that if he wanted to avoid termination, SEIFERT must immediately apologize in writing, and FERNANDEZ proceeded to dictate to SEIFERT the exact verbiage of the desired apology.   FERNANDEZ unequivocally stated if he did not receive the apology email by the end of the day, SEIFERT could consider himself "fired for cause."

39.     SEIFERT was taken aback with the tenor of the unexpected phone call, as well as by FERNANDEZ's lack of concern over the potential conflict of interest and disregard for corporate internal accounting controls in requesting to remit ORBSAT funds to his personal attorney without documentation or a conflict waiver. SEIFERT did not suspect that FERNANDEZ would escalate the disagreement that quickly and threaten SEIFERT's employment, placing FERNANDEZ's own personal agenda ahead of the company's interests and that of its shareholders.

40.     Shortly after the heated call with FERNANDEZ, a mutual friend of FERNANDEZ and SEIFERT called SEIFERT after having been made aware of the situation by FERNANDEZ. The mutual friend told SEIFERT that sending FERNANDEZ the apology email was in everyone's best interest.

41.     SEIFERT, concerned over threats to his livelihood, felt he had no choice, and under threat of termination emailed a written apology to FERNANDEZ that same evening, exactly as FERNANDEZ had instructed.   A copy of the email dated June 12, 2021 is attached as _Exhibit "4."_

42.     Despite the dictated apology that SEIFERT was required to send, it quickly became apparent that FERNANDEZ refused to move past the perceived slight of being reminded of proper corporate governance and internal accounting controls, and set in motion a retaliatory campaign to rid himself of SEIFERT and end his employment by any means.

**Second Spoofed Email Phishing Scheme Serves as a Pretext for SEIFERT's Termination**

43.     On June 16, 2021, as instructed by FERNANDEZ, SEIFERT began to issue payment to Nasdaq in connection with an invoice from the uplisting in late-May 2021.  Upon reviewing the invoice, SEIFERT noticed a discrepancy with the stated amount, believing it to be

too high as partial payment had already been remitted on or around May 27, 2021.  When SEIFERT contacted Nasdaq, he learned that Nasdaq never received the payment remitted in late-May, which led to the discovery of a series of unfortunate events which FERNANDEZ used as a pretext to end SEIFERT's employment.

44.     In speaking with Nasdaq, SEIFERT learned that he and ORBSAT had fallen victim to an email phishing scheme that resulted in ORBSAT unknowingly issuing a $45,000 wire transfer on May 27, 2021 to an incorrect bank account they believed belonged to Nasdaq.  The transfer request and false wire instructions came in a series of highly sophisticated and corroborating emails from multiple Nasdaq and ORBSAT representatives who SEIFERT was already familiar with. The emails obscured the email addresses of the Nasdaq and ORBSAT representatives, which were slightly altered and were designed to be unseen by SEIFERT.  A true and correct copy of the phishing emails that obscured the identity of the senders are attached as _Comp. Exhibit "5."_

45.     Adding to the scheme's sophistication and cunning, the senders of the spoofed emails had to have known that ORBSAT was expecting one or more emails with the wire instructions at that very moment as part of the uplisting process.  The spoofed emails appeared in a deliberately corroborative sequence in his inbox when the wire was due to be sent. Moreover, the scheme involved the imposters procuring multiple website domains that appeared nearly identical to the legitimate domains from which ORBSAT expected to receive one or more emails at that very time with the wire instructions. _See_ _Comp. Exhibit "5."_

46.     Further adding to the complexity of the inventive scheme, the spoofed emails were designed to hide the senders' email addresses from view, while copying the legitimate email addresses of Nasdaq's and ORBSAT's representatives into the email thread; giving the reader even

greater reason to rely on the authenticity of the emails as the visible email addresses of the senders were legitimate, while the obscured email addresses of the imposters who spoofed the emails were not visible without either physically clicking on their names in the header of each email or printing the email to a portable document format (a/k/a PDF).

47.     Making the phishing attack even more ingenious, the spoofed email senders' addresses were nearly identical to the addresses of Nasdaq's legitimate representatives, with just one or two letters out of sequence in the registered domains that sent the spoofed emails. Thus, making detection that much more difficult and unlikely. *See Comp. Exhibit "5."*

48.     SEIFERT saw but did not need to rely upon the first spoofed email as shortly after it was sent, a second spoofed email from a different apparent ORBSAT representative with whom SEIFERT was already familiar was sent in the same email thread and referred to the original spoofed email below in the thread from the Nasdaq representative, adding instant credibility and corroborating the information in the initial spoofed email that contained the false wire instructions. In reviewing the second spoofed email in the thread, which appeared higher in SEIFERT's inbox, it was entirely impossible for SEIFERT to see the email address of the sender of the initial spoofed email as it merely stated "On 2021-05-27 04:36, Michael Wolf wrote: …," with no ability to click on the initial sender's email address to see if the address was legitimate. *See Comp. Exhibit "5."*

49.     Unbeknownst to Nasdaq and ORBSAT at the time, either Nasdaq's, ORBSAT's or their respective representatives' email account(s), and outgoing emails to SEIFERT, had been spoofed and false wire instructions were delivered to ORBSAT.  SEIFERT had no reason to suspect the initial Nasdaq email or the second email in the thread from ORBSAT's representative had been tampered with, and SEIFERT was being pressured to complete the wire promptly.

50.     In accordance with ORBSAT's one and only procedure to follow when initiating

outgoing wire transfers, SEIFERT conferred with Mr. Phipps, who was ORBSAT's CEO at the time, and proceeded to complete the wire transfer on May 27, 2021, based on the express approval he received from Mr. Phipps. No other procedures existed with respect to initiating outgoing wires. Unbeknownst to SEIFERT at the time, the wired funds were re-routed and never received by Nasdaq.

51.     Upon learning this information on June 16, 2021, SEIFERT immediately reported it to other ORBSAT executives and counsel, starting with Mr. Phipps and ORBSAT's SEC regulatory counsel, and then once he was available, FERNANDEZ.

52.     When SEIFERT alerted ORBSAT's SEC regulatory counsel about the email phishing attack, the counsel advised SEIFERT to notify the FBI and submit a claim, and then based on his recollection of the prior weekend's events, stated, "You know, Charlie [FERNANDEZ] is probably going to try to use this to fire you."

53.     SEIFERT initiated a claim and submitted it to the FBI. On information and belief, the email phishing attack is under criminal investigation. SEIFERT is not suspected of any wrongdoing or involvement and is as much a victim of the attack as ORBSAT, nor did SEIFERT act recklessly or with negligence as he followed the only procedure ORBSAT had for initiating outgoing wire transfers. Nonetheless, FERNANDEZ capitalized on the fraudulent email scheme that targeted SEIFERT and ORBSAT and used SEIFERT's unwitting issuance of the misdirected wire transfer as a convenient but pretextual excuse to end his employment.

## Series of Escalating Retaliatory Misconduct Against SEIFERT

54.     Commencing June 17, 2021, and continuously thereafter, FERNANDEZ orchestrated SEIFERT's retaliatory termination using the second phishing scheme with the false Nasdaq wire instructions as a pretext.   SEIFERT received numerous emails and telephone calls

from FERNANDEZ and Mr. Phipps, who at FERNANDEZ's insistence, pressured SEIFERT to renounce his position as CFO and take a significantly reduced severance, disregarding SEIFERT's June 2, 2021 employment agreement.

55.     On June 18, 2021, SEIFERT was initially presented with an "offer" to resign his position, terminate the June 2, 2021 employment agreement, execute a release, and accept a nominal severance package to remain with ORBSAT as an at-will employee until completion of the next quarterly 10-Q report.  SEIFERT was pressured by multiple parties connected with ORBSAT and FERNANDEZ to accept the severance offer within three days, by June 21, 2021.

56.     SEIFERT is more than 40-years old and is entitled to protection under the Older Worker Benefit Protection Act, providing him certain rights, including the right to 21-days to consider a severance offer and release as well as seven days to revoke any such acceptance. Those rights were denied to SEIFERT as ORBSAT pressured SEIFERT to accept the offer immediately.

57.     Then on June 21, 2021, after SEIFERT indicated that he would not be coerced and bullied into immediately accepting the severance offer that was inconsistent with his June 2, 2021 employment agreement, FERNANDEZ and ORBSAT ratcheted up the pressure by sending SEIFERT a "Notice of Suspension of Employment" with FERNANDEZ's signature block.  The Notice purported to suspended SEIFERT with pay and demanded that he cease performing as ORBSAT's CFO, Secretary and Treasurer while the company "conduct[s] an investigation of your actions identified below," citing to the second phishing email attack and the false Nasdaq wire instructions. The Notice also misrepresented the facts in connection with the phishing attack. Among the misrepresentations was that SEIFERT had failed to abide by established procedures for wire transfers, as none of the procedures FERNANDEZ listed existed during SEIFERT's employment and were created after the fact. The notice also falsely accused SEIFERT of failing

to "timely report the wrongful conduct to us exacerbating the damages," as SEIFERT immediately reported the incident upon learning of it.

58.     The Notice concluded: "We expect you to cooperate with Corporation's (sic) investigation into the Wire Transfer, including (sic) any individual or committee designated to conduct this investigation."   A copy of the Notice of Suspension of Employment" is attached as *Exhibit "6."*   SEIFERT was not told who at ORBSAT he was to cooperate with in investigating the email phishing attack that he had already reported to the FBI at the advice of ORBSAT's counsel.

59.     Upon receiving the Notice that he was suspended, SEIFERT knew that ORBSAT's SEC counsel was correct when he warned SEIFERT that FERNANDEZ would use the second phishing attack as a pretext to terminate SEIFERT's employment. In response to the Notice, SEIFERT sent an email to FERNANDEZ stating in part:

> I am in receipt of your Notice of Suspension of Employment which is disingenuous at best. Your discussion of the wire transfer as the purported basis for my suspension is false, and is a transparent attempt to justify my firing without good cause. . . As you well know, your threats and demands against my employment commenced before anyone had even discovered the theft of the wire transfer.   Your choice to ignore these facts in your suspension letter is telling of your motivation, which is to falsely drum up cause to retaliate against me for refusing to toe the line for you, even at the company's expense.  The actual sequence of events, email correspondence and the belated false basis you are now trying to create to say I am being terminated for cause is transparent and I believe any court will agree.

60.     FERNANDEZ did not await an investigation of the email phishing scheme as his June 21, 2021 Notice of Suspension had indicated, because the very next day, early on June 22, 2021, SEIFERT received FERNANDEZ's Notice of Termination of Employment. The termination Notice also mispresented the facts surrounding the second phishing attack including non-existent "corporation policies relating to wire transfers", asserted other unfounded grounds, and instructed SEIFERT to contact his replacement, ORBSAT's new Chief Financial Officer, Sarwar Uddin.  A

copy of the Notice of Termination of Employment" is attached as _Exhibit "7."_

61.     The swiftness with which SEIFERT was suspended and terminated, and with which SEIFERT's replacement, Mr. Uddin, was hired, just five days after the discovery of the second email phishing scheme, strongly indicates that FERNANDEZ's plans to remove SEIFERT predated the discovery of the second email phishing scheme and was unrelated thereto.

62.     On June 23, 2021, following SEIFERT's termination, FERNANDEZ and ORBSAT filed an 8-K report to the SEC reflecting that SEIFERT was terminated, stating: "On June 22, 2021, the Company appointed Sarwar Uddin as the Chief Financial Officer of the Company. Mr. Uddin replaced Thomas Seifert, whose employment by the Company terminated on the same date."

63.     Also on Wednesday, June 23, 2021, SEIFERT's newly retained counsel sent ORBSAT a letter recounting the events of the prior 30-days and announcing SEIFERT's intention to initiate litigation against ORBSAT and FERNANDEZ within three business days (no sooner than June 29, 2021) for breaching SEIFERT's June 2, 2021 employment agreement and for, _inter alia_, the unlawful retaliatory misconduct against him, unless ORBSAT agreed to compensate SEIFERT pursuant to his June 2, 2021 employment agreement (the "Litigation Notice"). The Litigation Notice also conveyed SEIFERT's willingness and desire to return copies of all ORBSAT documents in SEIFERT's possession for which ORBSAT did not already have a copy, asking ORBSAT to specify any such documents it wished SEIFERT to provide. The Litigation Notice also forewarned ORBSAT not to publish any false or defamatory statements pertaining to SEIFERT's termination or that would "reflect negatively on Mr. Seifert's business, trade, and profession as a financial professional. . ."

64.     Within a day of sending the Litigation Notice, Gary Phillips contacted SEIFERT's counsel and advised he had read the Litigation Notice and disagreed with the facts recited therein.

Mr. Phillips also stated that he was recently retained by ORBSAT in connection with SEIFERT's claims in the Litigation Notice and that in case it was unclear, ORBSAT revoked its severance offer to SEIFERT.

65.     On June 24, 2021, SEIFERT filed a whistleblower claim with a governmental authority (OSHA) regarding the unlawful retaliation he experienced immediately after objecting to FERNANDEZ's instruction to remit $25,000 of ORBSAT's funds to FERNANDEZ's personal counsel in violation of applicable law.

66.     On Monday, June 28, 2021, following Mr. Phillips' brief conversation with SEIFERT's counsel regarding SEIFERT's Litigation Notice, FERNANDEZ and ORBSAT maliciously made false and defamatory public statements in written reports to the SEC that are published online regarding SEIFERT's termination, and further published the false statements on their corporate website, at https://ir.orbsat.com/sec-filings.

67.     FERNANDEZ and ORBSAT falsely reported the grounds for SEIFERT's termination, falsely reported that SEIFERT was terminated for cause, and falsely reported that the company had claims to assert against SEIFERT "including but not limited to rescission of the employment agreement, fraud in the inducement in connection with the execution of the employment agreement, and breach of the fiduciary duties of good faith and loyalty."

68.     SEIFERT's termination was pretextual and retaliatory and was motivated principally by SEIFERT's objections to FERNANDEZ's unilateral instructions that SEIFERT remit $25,000 to his personal attorney to retain him on behalf of ORBSAT, in violation of applicable SEC rules.  SEIFERT objected because FERNANDEZ's directive and desired retention was not approved by any disinterested company executives or directors, nor vetted for possible conflicts of interest, was not backed by an executed retainer agreement to document the transaction

and engagement and did not adhere to any of the SEC rules mandating compliance with internal accounting controls that governed ORSBAT as a publicly traded company.

69.     At no time prior to his termination did FERNANDEZ and ORBSAT advise SEIFERT that he was being fired because of any fraud related to his Employment Agreement.

### COUNT I - BREACH OF EMPLOYMENT AGREEMENT
-Against ORBSAT-

Plaintiff SEIFERT restates and reasserts the allegations contained in Paragraphs 1-69 as though fully set forth herein.

70.     SEIFERT dutifully performed work and provided services to ORBSAT in compliance with the June 2, 2021 Employment Agreement as described above, including by serving as its Chief Financial Officer, Secretary and Treasurer.

71.     The June 2, 2021 Employment Agreement was for an initial three-year term and could only be terminated "for cause" as defined therein under certain specified conditions, including written notice, and otherwise could only be terminated "without cause" if a stipulated severance amount were timely paid to SEIFERT and his benefits remained in place for a twelve-month period thereafter.   None of these material provisions have been adhered to by ORBSAT.

72.     ORBSAT purported to terminate SEIFERT "for cause" based on purported facts ORBSAT knowingly misrepresented in connection with the second email phishing attack.

73.     The second phishing email phishing attack was a highly sophisticated attack, with indications that it may have been an inside job, that would not have ordinarily been discovered in SEIFERT's exercise of due care.

74.     As set forth in detail hereinabove, SEIFERT carefully reviewed the emails in connection with the second email phishing attack and reasonably believed them to be legitimate

wire transfer requests from Nasdaq that were corroborated by further emails in the same chain from an ORBSAT representative known to SEIFERT.

75.     Based on the apparent credibility of the emails sent to him in connection with the second phishing attack, SEIFERT then followed ORBSAT's one and only procedure in order to send out a wire transfer and obtained Mr. Phipps' express approval to initiate the wire transfer.

76.     Despite knowledge that SEIFERT had at all times exercised due care and complied with ORBSAT's one and only procedure for initiating wire transfers, ORBSAT falsely accused SEIFERT of gross negligence for failing to follow non-existent wire transfer procedures in connection with this second email phishing attack, attempting to use this second email phishing attack as a pretextual reason for ORBSAT to terminate SEIFERT.

77.     The supposed "cause" invented by ORBSAT to terminate SEIFERT was entirely pretextual to enable ORBSAT to ostensibly justify ORBSAT's ongoing intention to get rid of SEIFERT after SEIFERT objected and refused to participate in unlawful activity on behalf of ORBSAT at the request of FERNANDEZ. ORBSAT therefore breached the June 2, 2021 Employment Agreement by terminating SEIFERT's employment without the requisite cause, and without the requisite notice, and otherwise for pretextual and unjustified reasons that did not support his termination under the Employment Agreement.

78.     As a result of ORBSAT's breach of the June 2, 2021 Employment Agreement, SEIFERT has suffered, and continues to suffer, damages, including but not limited to the loss of compensation and benefits.

WHEREFORE, SEIFERT demands entry of a judgment in his favor against ORBSAT for compensatory damages, including ongoing losses consisting of future wages and benefits, pre-judgment interest, and attorneys' fees pursuant to Fla. Stat. § 448.08, and any and all other relief

that the Court deems just and proper.

## COUNT II - RETALIATORY DISCHARGE
## FLORIDA PRIVATE WHISTEBLOWER ACT
### -Against ORBSAT-

Plaintiff, SEIFERT restates and reasserts the allegations contained in Paragraphs 1-69 as though fully set forth herein.

79.     This is an action for damages for retaliatory termination against Defendant ORBSAT pursuant to Florida Statutes § 448.102.

80.     At all material times, SEIFERT was an employee of ORBSAT as defined in Florida Statutes §448.101(2), as he performed services for ORBSAT and was under its control and direction for wages and other renumeration.

81.     At all material times, ORBSAT was an employer as defined in Florida Statutes §448.101(3) as it is a private company that employs ten or more persons.

82.     As set forth in detail hereinabove, SEIFERT became aware that ORBSAT participates and/or wished to participate in unlawful activities, such as avoiding corporate internal accounting controls and approvals in violation of applicable law.

83.     When FERNANDEZ insisted that SEIFERT assist ORBSAT in connection with such an unlawful activity, SEIFERT objected and refused to participate in the unlawful activity requested by FERNANDEZ – remitting $25,000 of ORBSAT's corporate funds to FERNANDEZ's personal attorney without first negotiating a legal retainer agreement at arms' length, and without complying with other required corporate internal accounting controls and corporate approvals for such a conflict-of-interest transaction, in violation of applicable SEC rules.

84.     SEIFERT objected on the grounds that the undocumented conflict of interest

transaction that FERNANDEZ directed he participate in was in violation of ORBSAT's governing documents, federal laws, state statutory and common law, and SEC and other regulations, including those governing publicly traded companies.

85.     SEIFERT believed that the remittance of $25,000 to FERNANDEZ's personal counsel, as requested by FERNANDEZ, without more or any additional documentation, would circumvent and otherwise violate internal accounting controls and protocols for preparation of mandatory reporting required for public companies, in violation of applicable law, including 15 U.S.C. §78m(b)(2),(5), and Exchange Act Rule 13b2-1, 17 C.F.R. § 240.13b2-1, amongst other related rules and regulations. In short, the complained of conduct would have been unlawful had SEIFERT carried it out as directed by FERNANDEZ.

86.     As a direct result of SEIFERT's objections to the unlawful activity, ORBSAT, through its agents and representatives, engaged in unlawful retaliatory conduct, including without limitation demoting, suspending and terminating SEIFERT's employment, and breaching his employment agreement.

87.     As a result of ORBSAT's unlawful, retaliatory conduct, SEIFERT has suffered damages, including but not limited to economic and non-economic damages.

WHEREFORE, SEIFERT demands judgment against ORBSAT for economic damages, including lost wages, benefits, and other remuneration; front pay and back pay; and other compensatory damages allowable under law; emotional distress damages, prejudgment interest and post-judgment interest; statutory attorneys' fees and costs, and any other and further relief as the Court deems just and proper.

### COUNT III - BREACH OF EMPLOYMENT AGREEMENT
-Against ORBSAT-

Plaintiff SEIFERT restates and reasserts the allegations contained in Paragraphs 1-69 as

though fully set forth herein.

88.     This action is brought in the alternative to Count I in the event the June 2, 2021 Employment Agreement is deemed not enforceable.

89.     SEIFERT dutifully performed work and provided services to ORBSAT in compliance with the March 11, 2021 Employment Agreement as described above, including by serving as its Chief Financial Officer.

90.     The March 11, 2021 Employment Agreement was for an initial one-year term and could only be terminated for cause as defined therein and under certain specified conditions, including written notice and a meeting of the Board prior to termination.

91.     ORBSAT breached the March 11, 2021 Employment Agreement by terminating SEIFERT's employment without the requisite cause, and without the requisite notice and meeting, and for pretextual and unjustified reasons that did not support his termination under the Employment Agreement.

92.     As a result of ORBSAT's breach of the March 11, 2021 Employment Agreement, SEIFERT has suffered, and continues to suffer, damages as a result of ORBSAT's failure to pay all compensation and benefits owed him.

WHEREFORE, SEIFERT demands entry of a judgment in his favor against ORBSAT for compensatory damages, including ongoing losses consisting of future wages and benefits, pre-judgment interest, and attorneys' fees pursuant to Fla. Stat. § 448.08, and any and all other relief that the Court deems just and proper.

## COUNT IV- DEFAMATION - LIBEL PER SE
### -Against ORBSAT and FERNANDEZ-

Plaintiff SEIFERT restates and reasserts the allegations contained in Paragraphs 1-69 as though fully set forth herein.

93.     At all material times, SEIFERT dutifully performed work and provided services to ORBSAT in compliance with his employment obligations and as its Chief Financial Officer, Secretary and Treasurer.

94.     On June 22, 2021, ORBSAT, with FERNANDEZ's participation, and under his direction and control, terminated SEIFERT's employment without cause, and without the requisite notice, and for pretextual and unjustified reasons that did not support termination under the Employment Agreement then in effect.

95.     Thereafter, in a transparent attempt to impugn SEIFERT's reputation and credibility and to otherwise stake out a favorable position in the litigation they knew SEIFERT intended to commence, on June 28, 2021, ORBSAT and FERNANDEZ filed new 8-K and Prospectus reports with the SEC that defamed SEIFERT by making false and derogatory public reports that accused SEIFERT of defrauding the company into extending him the June 2, 2021 Employment Agreement and of breaching his fiduciary duties and duties of good faith and loyalty to the company such that ORBSAT had determined to actually initiate litigation against SEIFERT. A copy of the June 28, 2021 Reports are attached hereto as _Comp. Exhibit "8."_   The identical defamatory statements are also published on ORBSAT's website.

96.     Although ORBSAT may have been subject to reporting requirements for any changes in or departures of directors and certain officers, ORBSAT could have satisfied its reporting obligations without impugning SEIFERT's character as it did.  The defamatory reports go out of their way to needlessly and maliciously impugn SEIFERT's character and professional reputation, and further the same retaliatory conduct that resulted in SEIFERT's wrongful termination.

97.     The false and defamatory reports are reasonably read by the community at large and/or certain substantial and respectable minorities of the community, including by other members of SEIFERT's trade and profession as a corporate financial professional, to impart the false implication that ORBSAT had a legitimate factual basis to allege that SEIFERT committed such dishonest and fraudulent acts as CFO of ORBSAT, and these false and defamatory reports also affirmatively suggest that the author intends and/or endorses this inference.

98.     The publication of the false and defamatory reports was without justification or privilege, despite ORBSAT's disingenuous attempts to (a) frame the false statements as part of a litigation strategy against SEIFERT; (b) initiate frivolous litigation against SEIFERT to cloak the false and defamatory reports with the qualified litigation privilege; and (c) assert unfounded claims against SEIFERT in order to provide ORBSAT with a purported basis to claim that the false implications in the reports were actually true.

99.     ORBSAT and FERNANDEZ knew that the statements contained in the false and defamatory reports would impart the false implication to relevant members of the community that the necessary factual basis existed to support the litigation, and further that these statements would result in material and substantial defamation of SEIFERT and his professional business reputation.

100.    The defamatory statements constitute libel per se as they are disparaging to SEIFERT and permanently injurious to his professional reputation and amount to allegations of felonious misconduct. Indeed, ORBSAT and FERNANDEZ falsely reported and falsely imputed to SEIFERT conduct, characteristics and/or conditions that are incompatible with his trade and profession as a corporate financial professional.

WHEREFORE, SEIFERT demands entry of a judgment in his favor against ORBSAT and FERNANDEZ for compensatory damages, including ongoing and future losses, punitive damages,

pre-judgment interest, and any and all other relief that the Court deems just and proper.

## COUNT V- NEGLIGENT MISREPRESENTATION
### -Against ORBSAT-

Plaintiff SEIFERT restates and reasserts the allegations contained in Paragraphs 1-69 as though fully set forth herein.

101.    ORBSAT, through its representatives such as Mr. Phipps, made certain misrepresentations to SEIFERT regarding a material fact.

102.    SEIFERT was repeatedly told that if he continued to perform services as ORBSAT's CFO and the Nasdaq uplisting were successful, his future with ORBSAT would be secure and his efforts would be rewarded with a long term-executive level employment agreement, which would replace his temporary Employment Agreement of March 11, 2021, and he would receive an executive-level salary, and additional stock ownership among other executive level benefits.

103.    The circumstances were such that ORBSAT's representatives knew or should have known of the falsity of the representations and that SEIFERT's future with the company was not assured or protected.

104.    In making the misrepresentations, ORBSAT intended that SEIFERT rely upon and act on them, and SEIFERT did rely on the false statements, dutifully performing work and provided services to ORBSAT, and significantly contributed to the Nasdaq uplisting and related public offering, all with the expectation that his position within the company would be protected with a long-term executive-level Agreement, an executive salary and additional company stock as was represented to him on numerous occasions, and which served as the consideration for SEIFERT's performance of his services for ORBSAT.

105.    Contrary to the numerous false assurances as to his long-term employment and executive level agreement and compensation package, upon which SEIFERT had relied to his detriment, just three weeks after ORBSAT extended an improved Employment Agreement on June 2, 2021, SEIFERT's employment was abruptly terminated contrary to the numerous pre- and post-contractual representations made to him and on which he relied.

106.    As a result of ORBSAT's negligent misrepresentations and SEIFERT's justifiable reliance, SEIFERT has been damaged.

107.    As a result of ORBSAT's negligent misrepresentation, SEIFERT has suffered, and continues to suffer, damages as ORBSAT failed and refusedto pay all compensation, additional stock and benefits promised him.

WHEREFORE, SEIFERT demands entry of a judgment in his favor against ORBSAT for compensatory damages, pre-judgment interest, and any and all other relief that the Court deems just and proper.

## DEMAND FOR JURY TRIAL

SEIFERT demands trial by jury for all claims so triable.

Dated this 17th day of September 2021.

Respectfully submitted,

**DAVIS GOLDMAN, PLLC**
*Counsel for Plaintiff*
1441 Brickell Avenue, Suite 1400
Miami, FL 33131
Telephone:  (305) 800-6673
Facsimile:   (305) 675-7880
Email: jgoldman@davisgoldman.com
Secondary Email: eservice@davisgoldman.com

By:/s/Jason N. Goldman
    JASON N. GOLDMAN
    Fla Bar No. 72527

**SAENZ & ANDERSON, PLLC**
*Counsel for Plaintiff*
20900 N.E. 30th Avenue, Ste. 800
Aventura, Florida 33180
Telephone: (305) 503-5131
Facsimile: (888) 270-5549

By:*s/Tanesha W. Blye*
    TANESHA WALLS BLYE
    Fla Bar No. 0738158
    Email: tblye@saenzanderson.com
    Secondary Email: ursula@saenzanderson.com
    R. MARTIN SAENZ
    Fla Bar No. 640166
    Email: msaenz@saenzanderson.com
    Secondary Email: ursula@saenzanderson.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by Electronic

Service via the CM/ECF system on September 17, 2021 on all counsel or parties of record on the

Service List below.

By: */s/Jason N. Goldman*
    JASON N. GOLDMAN

## SERVICE LIST

Gary S. Phillips, Esq.
George N. Andrews, Esq.
**PHILLIPS, CANTOR & SHALEK, P.A.**
*Counsel for ORBSAT CORP*
Presidential Circle
4000 Hollywood Boulevard, Suite 500-N
Hollywood, Florida 33021
Telephone: (954) 966-1820 / Fax: (954) 414-9309
Email (s): Primary: gphillips@phillipslawyers.com; ttrippe@phillipslawyers.com;
gandrews@phillipslawyers.com

Tanesha Walls Blye, Esq.
R. Martin Saenz, Esq.
**SAENZ & ANDERSON, PLLC**
*Co-Counsel for SEIFERT*
20900 N.E. 30th Avenue, Suite 800
Aventura, Florida 33180
Telephone: (305) 503-5131
Facsimile: (888) 270-5549
Email: tblye@saenzanderson.com;
msaenz@saenzanderson.com
Secondary Email: ursula@saenzanderson.com